### WALTERS et al. v. WESTERN & A. R. CO. (CAPITAL CITY BANK, Intervener).

#### (Circuit Court, N. D. Georgia. May 8, 1894.)

CARRIER OF GOODS—LIABILITY TO ASSIGNEE OF BILL OF LADING.

    Where the consignor's sight draft is attached to the bill of lading, and the carrier delivers the goods to a purchaser from the consignee without requiring the bill of lading to be delivered up, such carrier is liable to a bank which advances the money to the consignee to pay the draft, and takes the bill of lading as security therefor.

This was a suit by William T. Walters and others against the Western & Atlantic Railroad Company, in which the Capital City Bank intervened. The receivers of defendant excepted to the master's report.

Goodwyn & Westmoreland and John C. Reed, for intervener.

Julius L. Brown, for defendant.

NEWMAN, District Judge. The authorities cited by counsel for the receivers seem undoubtedly to establish the proposition that

where a time draft is drawn by the consignor of goods, and attached
to a bill of lading for the goods, and the draft is sent to a bank for
collection at the place to which the goods are consigned, an ac-
ceptance by the drawee entitles him to have the bill of lading de-
livered to him; the reason given for this ruling being that the
consignee is expected to sell the consigned goods in order to realize
funds with which to take up the draft by the time it matures.
National Bank of Commerce v. Merchants' Nat. Bank, 91 U. S. 92;
Woolen v. Bank, 12 Blatchf. 359, Fed. Cas. No. 18,026; Bank v.
Wright, 48 N. Y. 1; Bank v. Luttgren (Minn.) 13 N. W. 151; Erwin
v. Harris, 87 Ga. 335, 13 S. E. 513.   The difficulty about the applica-
tion of that proposition to the present case is that the drafts here
are sight drafts, and the reason upon which those cases rest does
not apply; second, the facts of the transaction here are otherwise
entirely different from those in the cases which have been cited
as authority for the proposition above referred to.   In the case at
bar the draft was drawn on G. B. Everett & Co., and was paid by the
intervener, the Capital City Bank, at the request of G. B. Everett
& Co., and the money charged to their account.   At the time of the
payment of these drafts by the intervener, the goods seem to have
been sold by Everett & Co. to Akers & Bros., and what is called on
the one hand a promissory note, and on the other a mere agreement
to purchase, was given by Akers & Bros.   The following is a copy
of one of the papers, all of the others being of the same character,
except as to amounts, number of cars, and dates:

"$542.26.                                              Due Dec. 16.
                            "Atlanta, Ga., Oct. 6th, 1889.
    "Forty-eight days after date, we will pay to G. B. Everett & Co., on presen-
tation of bills of lading for cars 18x12624, five hundred and forty-two 28–100
dollars.
    "Net, ——.   Int., 7.05.
        "[Signed]                                    Akers & Bros."

The method of proceeding of the bank was to take this paper
made by Akers & Bros., attach it to the bill of lading which covered
the same cars of grain, and hold the same as security for Akers &
Bros.' obligation.   It appears, also, that Everett & Co. continued to
be bound to the bank, or at least that firm so considered itself from
other evidence in the case, which it is not deemed material to go
into now.   At all events, it is clear that the bank held the bills of
lading as security for money advanced on the faith of the con-
signment covered by the various bills of lading.

It is said, applying the rule to be adduced from the authorities
which have been referred to above as cited by counsel for the re-
ceivers, that, if an acceptor of a time draft is entitled to the bill of
lading, equally so is the drawee when he pays off the bill of lading;
and it is urged that when the Capital City Bank paid the drafts,
and sent the money on to the drawer, charging the same to Everett
& Co., Everett & Co. were entitled to receive the bills of lading.
Then it is said that, Everett & Co. having sold the grain to Akers
& Bros., the latter firm were entitled to have the bills of lading
turned over to them; and if the railroad company delivered the cars

of grain to the persons who, in law, really had the bills of lading, or ought to have had them, they should be acquitted of any liability in the matter of injury to other persons. If the bank in this case had been paid the amount of the draft, and there had been no other transactions with them, then there might be some force in the position assumed for the receivers, but the additional facts appear which have just been stated. The bank paid the draft for Everett & Co., holding the bills of lading for the advance thus made, in connection with the paper made by Akers & Bros., copied above.

The whole question comes back to this: that the railroad company should have required the bills of lading to be given up before delivering the goods, and, when they allowed Akers & Bros. to receive these goods without at the same time receiving from them the bills of lading, they did so in violation of the rights of this intervener, who seems in the utmost good faith to have advanced the money upon the credit of the goods covered by the bills of lading, and of their being in possession of the railroad company. While it is conceded that bills of lading are not "negotiable instruments," in the full sense of that term, still they do represent the goods which they cover, and may be taken as security for money advanced while the consignment is in the hands of the railroad company. Among the cases which might be referred to, the following are named, because they are supreme court decisions, and the doctrine they enunciate controlling: Conrad v. Insurance Co., 1 Pet. 386; The Thames, 14 Wall. 98; North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 8 Sup. Ct. 266, and cases therein cited. It is apparent that the bank would have been fully protected if the railroad company had required the bills of lading to be delivered, or had exercised any reasonable degree of diligence in ascertaining the person entitled to receive the goods before releasing possession.

The Friedlander Case, 130 U. S. 416, 9 Sup. Ct. 570, can have no application here. There is no claim whatever that these bills of lading were accomplished. In the case of Inman, intervener, against these same receivers (56 Fed. 369), the contention was that the bills of lading had been delivered up and reissued by the agent. No claim of that kind can, of course, be interposed here. What the Friedlander Case decided was that where the agent of a railroad company fraudulently issued bills of lading for goods, when no goods had, in fact, been delivered, such agent goes entirely beyond the scope of his authority, and his principal (the railroad company) is not bound. It is held that his authority from the company is to issue bills of lading for goods delivered, and that that is the scope and extent of his agency, and, when he goes beyond that, he cannot bind the company by his actions. It is unnecessary here to go into the facts of the agency at McIvors, at which point these goods were delivered, and the method of Akers, as agent, and of Akers & Bros., in transacting their business, as they were fully discussed in the Case of Inman, supra, and further reference to the matter here would be a mere repetition.

As to the question of demand, and as to whether or not Mr. Dickey, the general freight agent, was the proper official on whom

to make demand, it is sufficient to say that he seems to have undertaken to represent the railroad company in the matter, and made no question whatever as to his authority to act in the premises. He was the general freight agent of the company, and from this designation it would seem that he had general supervision over all its freight business, and really appears to have been the proper person, of all others, upon whom demand should have been made. If not, he at least should have referred the representative of the intervener to some one else who had authority to act in the matter. The exceptions must be overruled, and the report of the master be confirmed.